UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RICARDO H. R.,** | Civil Action No. 20-5134 (MCA) |
| Petitioner, | |
| v. | OPINION |
| **H.O. THOMAS DECKER, et. al,** | |
| Respondents. | |

**ARLEO,** U<small>NITED</small> S<small>TATES</small> D<small>ISTRICT</small> J<small>UDGE</small>

Petitioner Ricardo H.R. ("Petitioner" or "Ricardo H.R.") is a native and citizen of the Dominican Republic, who is currently in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), and detained at Hudson County Correctional Facility ("HCCF" or the "Facility") in New Jersey. On April 27, 2020, Petitioner filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 and a motion for a temporary restraining order and preliminary injunction seeking immediate release from detention based on his medical conditions that render him vulnerable to severe illness or death if he were to contract the novel coronavirus disease 2019 ("COVID-19"). *See* ECF Nos. 1-2. Respondents oppose the Motion. *See* ECF No. 13. Having reviewed the parties' submissions, including their supplemental submissions, and examined the applicable law, the Court now grants the Petition insofar as it seeks a Preliminary Injunction requiring Petitioner's release, and orders Respondents to immediately release Petitioner subject to conditions set forth in the accompanying Order.

1

I.  **FACTUAL BACKGROUND**

   a. **The COVID-19 Health Crisis**

On March 11, 2020, the World Health Organization classified COVID-19 as a global pandemic, anticipating that "the number of cases, the number of deaths, and the number of affected countries" would increase.[1] Around that time, the United States had reported only approximately 1,000 cases of COVID-19.[2] As of June 28, 2020, that number has risen to over 2.5 million and the virus has taken 125,804 lives nationally.[3] New Jersey alone has reported a total of 173,036 cases and 12,769 deaths as of June 28, 2020.[4] Hudson County, where Petitioner is detained, currently has the second-highest number of COVID-19 cases in the state, with 19,005 cases as of June 28, 2020.[5]

According to the Centers for Disease Control and Prevention (the "CDC"), COVID-19 spreads "mainly from person-to-person" between those "who are in close contact with one another (within about 6 feet)" and possibly when people touch contaminated surfaces and then touch their mouths, noses, or eyes.[6] Common symptoms of COVID-19 include fever, cough, and shortness of breath.[7]

---

[1] World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] *Coronavirus Case Total Climbs in New York*, THE NEW YORK TIMES (Mar. 11, 2020) https://www.nytimes.com/2020/03/11/nyregion/coronavirus-new-york-update.html.

[3] *Coronavirus in the U.S.: Latest Map and Case Count,* THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html, (last visited Jun. 28, 2020).

[4] *New Jersey Coronavirus Map and Case Count*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html, (last visited Jun. 28, 2020).

[5] *Id.*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html#county (last visited Jun. 28, 2020.

[6] Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Jun. 17, 2020).

[7] *Id.*; Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Jun. 17, 2020).

Experts still have much to learn about how the virus spreads. In early April, the CDC director, Dr. Robert Redfield, in an interview with National Public Radio affiliate WABE, stated that "a significant number of individuals that are infected actually remain asymptomatic. That may be as many as 25 percent[,]" and this is important because asymptomatic individuals contribute to the transmission of the virus.[8] Furthermore, those who become symptomatic can likely transmit the virus up to 48 hours before they show symptoms.[9] These asymptomatic transmitters and individuals who are transmitting the virus before they become symptomatic help explain how rapidly the virus can spread.[10]

Symptoms of COVID-19 can be mild, and "[a]nyone can have mild to severe symptoms."[11] As explained by the CDC, "[s]ome people are more likely than others to become severely ill, which means that they may require hospitalization, intensive care, or a ventilator to help them breathe, or they may even die."[12] Among them are persons who are those over the age of 65 and people of any age with certain underlying health conditions such as serious heart conditions, diabetes, chronic kidney disease, chronic obstructive pulmonary disease, obesity, moderate to severe asthma, and hypertension. ("CDC Risk Factors").[13] The CDC now advises that certain populations

---

[8] *CDC Director On Models For The Months To Come: 'This Virus Is Going To Be With Us'*, NPR, https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us; *see also* Apoora Mandavilli, Infected but Feeling Fine: The Unwitting Corona-virus Spreaders, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[9] *Id.*

[10] *Id.* The CDC also states in its guidance that "COVID-19 may be spread by people who are not showing symptoms." Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Jun. 17, 2020).

[11] Ctrs. For Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Jun. 17, 2020).

[12] Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Jun. 26, 2020).

[13] On June 25, 2020, the CDC updated its guidance to include additional medical risk factors, reflecting available data as of May 29, 2020. Ctrs. For Disease Control and Prevention, *People of Any Age with Underlying Medical Conditions*,

may be at higher risk of contracting COVID-19 or developing severe symptoms, including those in long-term care facilities, those with disabilities or behavioral disorders, members of racial or ethnic minority groups, pregnant women, and those who are homeless.[14]

There is presently no vaccine to prevent COVID-19 infections.[15] The CDC and health experts thus emphasize the importance of "social distancing" (i.e. staying at least six feet apart), regularly disinfecting "high touch" surfaces, and wearing cloth face covering to curtail the spread of the virus.[16] Ultimately, "[t]he best way to prevent illness is to avoid being exposed to this virus."[17]

But in truth, avoiding exposure to COVID-19 is impossible for most detainees and inmates in correctional facilities, and detainees who meet the CDC's criteria for "higher risk" are the most vulnerable to a detention facility's shortcomings. In its guidance for correctional facilities, the CDC has explained that, among other things, the crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited options for medical isolation present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *See* ECF No. 13-1, CDC March 2020 Interim Guidance ("CDC Interim Guidance") at 2. Consequently, practicing social distancing and ensuring proper hygiene to minimize the risk of infection are exceedingly difficult, and the CDC Interim Guidance recommends extensive testing, cleaning and quarantining procedures to contain the spread of infection. *Id.*

---

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited June 26, 2020).

[14] Ctrs. for Disease Control and Prevention, *People Who Need to Take Extra Precautions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html (last visited June 26, 2020).

[15] Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/index.html (last visited June 25, 2020).

[16] Ctrs. for Disease Control and Prevention, *supra* note 12.

[17] *Id.*

Against this backdrop, Petitioner asserts that he has medical conditions that increase his risk of serious complications or even death if he were to contract COVID-19 and that the measures taken by HCCF are insufficient to protect him from harm.

### b. Petitioner's Medical Conditions

Petitioner is a 39-year-old man who suffers from essential hypertension and a modestly enlarged heart. *See* Petition ¶ 6; ECF No. 15-2, ECF No. 15-2, Ricardo H.R. Decl. ¶¶ 3-8. Petitioner also reports that doctors have diagnosed him with "asthma, and gastro-esophageal reflux disease, as well as major depressive disorder." Ricardo H.R. Decl. ¶ 8. Petitioner's medical expert Dr. Greifinger has opined that, "[s]hould he contract COVID-19, [Petitioner] is at high risk of serious complications or death because of at least two independently sufficient factors: heart disease and hypertension." ECF No 15-4, Supp. Greifinger Decl. ¶ 7. The medical records submitted by Petitioner confirm his hypertension diagnosis. *See* HCCF Medical Records at 2, 4-8, 10, 12, 15. Specifically, Petitioner's blood pressure remains high (154/109 on May 18), *id.* at 6, and the "degree of control" of his hypertension is described as "poor," *id.* at 7. Accordingly, the dosage for Petitioner's blood pressure medication has increased: While he was previously prescribed lisinopril 10 mg, id. at 2, 15, on May 18 his prescription was changed to lisinopril 20 mg-hydrochlorothiazide 12.5 mg, *id.* at 5, 8, 12. Petitioner's expert also opines that his uncontrolled high blood pressure places him at high risk of serious complications or death if he were to contract COVID-19. *See* Supp. Greifinger Decl. ¶¶ 3-12, 24.

Petitioner has been treated for his hypertension and chest pains during his detention at HCCF. "Around April 3, 2020, [he] felt sharp pain in [his] chest, body aches, and headaches. [He] was taken to the medical unit, and told [his] blood pressure was high. Ricardo H.R. Decl. ¶ 5. "Around April 6, 2020, [he] again felt chest pain and had difficulty breathing. [He] was told that

5

[he] would be tested for COVID-19 the following day, April 7, 2020, but [he]was never tested." *Id.* ¶ 6. On April 19, 2020, he "had chest pains, a headache, and difficulty breathing" and was again transported to the medical unit, where [he] was told [his] blood pressure was high and given Clonidine and an albuterol inhaler." *Id.* ¶ 7. He was diagnosed with hypertension, and given a prescription for lisinopril the following day. *Id.* Petitioner spent 13 days in the medical unit at HCCF—from April 19 to May 2. *Id.* ¶ 19.

While he was in the medical unit, Petitioner was also given a COVID-19 test but was not informed of the results of the test. *Id.* ¶ 23. Petitioner tested negative for COVID-19 on April 27, 2020. *See* ECF No. 15-1 Declaration of Lillian Novak ("Novak Decl."); *see also* ECF No. 16. Petitioner was unaware of his test results as of May 4, 2020. *See* Ricardo H.R. Decl. ¶ 28. Petitioner expressed fear and confusion over this lack of transparency, particularly because he was moved back to a general population unit on May 2, 2020, without knowing his test results. *Id.* ¶¶ 23, 28.

### c. The Protocols to Address COVID-19 at HCCF

Respondents assert that HCCF has taken sufficient precautions to mitigate the risk of COVID-19 exposure arising from external and internal influences, and these protocols are summarized below.[18]

Although HCCF is still accepting ICE detainees, with exceptions, detainees and inmates are subject to medical evaluations before entering. Edwards Decl. ¶¶ 12.b.i., 12.b.ii., 12.b.vii.

---

[18] Respondents relied on an earlier declaration from Ronald Edwards, but Petitioners have provided the Court with the Seventh Amended Declaration of Ronald Edwards. *See* ECF No. 23-1, Edwards Decl.

HCCF has suspended all social visitations and tours, and only "no-contact" visits and telephone conferences are permitted with attorneys. Edwards Decl. ¶¶ 12.d.i, 12.h.-j.

In addition to their efforts at preventing exposure from external factors, HCCF has taken affirmative steps to lessen the risk of COVID-19 exposure and transmission within the jails. HCCF has implemented a "[r]estrictive schedule." Edwards Decl. ¶ 11. As a social distancing measure, beginning on March 21, 2020, the "recreation period" is now staggered to permit only two "inmates/detainees" to leave their cells for a thirty-minute recreational-use period. *Id.* ¶ 12.k. Detainees have meals inside their cells to prevent congregation. *See id.* ¶¶ 12.e, 13.e. With respect to cleaning and hygiene, HCCF "lock[s] down" each housing unit in between shifts for cleaning and sanitization, which occurs, at a minimum, three times per day. *See id.* ¶¶ 11, 12.e. HCCF also reports that it cleans the recreation areas "constantly" each day, *id.* ¶ 12.k, but does not state when, how often, and what that cleaning entails. It has provided its staff with PPE. *Id.* ¶ 13.c. Additionally, the entire inmate and detainee population has been provided surgical masks. *Id.* ¶ 25.

HCCF follows isolation and quarantine protocols for confirmed and suspected cases of COVID-19. Confirmed cases that do not require hospitalization are isolated in a designated area. Edwards Decl. ¶ 15. Symptomatic inmates or detainees who are awaiting test results are isolated or quarantined, Edwards Decl. ¶ 16. Finally, those who are asymptomatic but "have had a known exposure" to a confirmed COVID-19 case are "cohorted" together with restrictive movement for a fourteen-day period. Edwards Decl. ¶ 17. Cohorting ends if no new COVID-19 case develops within that period. *Id.*

HCCF has on-site medical personnel who are available 24/7. Edwards Decl. ¶ 7. Detainees and inmates at the Facilities are able to make daily sick calls to on-site medical staff. Edwards

¶ 14. If detainees or inmates complain of illness, medical staff evaluates them. Edwards ¶ 14. Those who present with COVID-19 symptoms are provided a "surgical mask." *Id.* HCCF uses some form of COVID-19 testing on inmates. *Id.* ¶ 15.

As for detainees and inmates with high-risk health conditions, as identified by the CDC, HCCF "[e]stablished a new protocol" that includes "daily monitoring" and establishing "a plan to remove [them] from the rest of the population if determined to be necessary" from the Facility's "Medical Department." *Id.* ¶ 12.g.iv. 25. Such are housed by themselves, and the correctional officers who work with those inmates and detainees are using full PPE including suits, N95 masks and gloves. *Id.* ¶ 25.

As of May 17, 2020, HCCF identified the following cases of COVID-19, confirmed by testing, among HCCF inmates, detainees, and staff: 17 ICE detainees have tested positive for COVID-19, and there was 1 positive test result since last week; 27 county and federal inmates have tested positive for COVID-19, and there were no new positive test results since last week. *See* ¶ 20.B.

As of May 17, 2020, 97 HCCF staff members have tested positive for COVID-19 and there have been no new positive test results since last week. *Id.* ¶ 20.C. Two members of the HCCF correctional staff, the former facilities commissary director, and two nurses who worked at HCCF have died from complications from COVID-19. *Id.* ¶ 21.

HCCF is in the process of testing all law enforcement officers; of the 350 law enforcement officers, 284 have been tested for COVID-19. *Id.* ¶ 22. The number that tested negative is 187, and the number who have tested positive is 97, 84 of which have recovered and returned to duty. *Id.*

The total number of inmates and detainees is currently 711, and the number of inmates and detainees who have been tested for COVID-19 is 106. *Id.* ¶ 23. The number of inmates and

detainees who have tested negative is 62. *Id.* Of the 44 inmates and detainees who tested positive for COVID-19, 43 have made a full recovery, and none of the inmates or detainees who tested positive has been hospitalized. *Id.*

In contrast to its plan to test all law enforcement officers, HCCF has no plan to test the entire HCCF inmate and detainee population, as it is not mandated by any federal, state or county health agency, and such "testing has focused on people with symptoms consistent with a COVID-19 infection and first responders." *Id.* ¶ 24.

### d. Petitioner's Experiences at HCCF

Petitioners recent experiences at HCCF in both the general population and the medical unit highlight the disconnect between the stated protocols at HCCF and Petitioner's lived experiences, which include dirty living conditions, an inability to socially distance, and inconsistent quarantine procedures.

In early March 2020, Petitioner was moved from the dorm to a two-person cell, which was "very dirty, and looked like no one had lived in it for years." *Id.* ¶ 13. Petitioner and his cellmate requested cleaning supplies, but were denied, so they had to use just hot water to try to clean their shared cell. *Id.* Petitioner was only allowed to leave his cell for 30 minutes each day, from 6 a.m. to 6:30 a.m. every morning and tried to use that time to call his family, but, due to the time, he was usually not able to reach his family or lawyer. *Id.* ¶ 14. When he asked for the time to be changed so he could speak to his children, the request was denied. *Id.*

Petitioner reports that "[e]veryone in [his] unit has to share phones, videoconferencing equipment, and microwaves. These items are not sanitized between people." *Id.* ¶ 15. Petitioner requested disinfecting wipes, but his request was denied, and he reports that he has "seen some detainees using socks to cover the phone mouthpiece to try to avoid being infected." *Id.*

Petitioner also reports that "[t]he only toilet [he] could use for 23.5 hours a day was the dirty one in [his] cell, and there was no covering [he] could use for privacy." *Id.* ¶ 16. The guards told him to clean the toilet himself, but he was not given any cleaning supplies or protective equipment such as gloves. *Id.*

Petitioner received one mask in early April, and had to continue to reuse it for at least three weeks. *Id.* Petitioner also reports that is it difficult to obtain personal hygiene supplies. *Id.* ¶ 17. Although each person is supposed to be given two bars of soap and a toothbrush, the soap is not given out regularly, and sometimes detainees are told there is not enough. *Id.* There have been several times when Petitioner has not been able to shower for a few days because he did not have soap, and requests for soap are often denied. *Id.*

As noted above, Petitioner was housed in the medical unit from April 19, 2020 until May 2, 2020, and did not have access to any of his personal items, including his soap and toothbrush. *Id.* ¶ 19. He requested these items but did not receive them and could not shower or brush his teeth for 13 days. *Id.* While in the medical unit, Petitioner continued to be confined in the cell for 23.5 hours a day. *Id.* ¶ 20. Petitioner reports that his cell in the medical unit was just as dirty as his old cell, and no one cleaned the cell or gave him cleaning supplies to use. *Id.*

Petitioner also explains that the medical unit is shared by both immigration detainees and criminal inmates, and the unit has both people who are sick and new arrivals who are quarantined. *Id.* ¶ 21. Petitioner had to share phones and common areas with everyone in the medical unit, and he was not given any additional personal protective equipment even though he was in a unit with people who have symptoms of COVID-19. *Id.* While housed in the medical unit, Petitioner met a man who was brought in because he tested positive for COVID-19, but he was only in medical for six days before he was returned to his unit. *Id.* ¶ 22.

Upon his return to general population, Petitioner was placed in a different unit but conditions were the same as the conditions in his prior unit. *Id.* ¶ 24. Petitioner reports that there are about 45 people in his unit right now, the unit "is still dirty", and detainees "still share common areas and resources like telephones, showers, and microwaves." *Id.* ¶ 25. The common areas "are still not cleaned" and Petitioner and other detainees "have resorted to using toilet paper to clean" when they can. *Id.*

Petitioner is currently in a cell alone without a roommate but believes this is temporary until a new person comes to the unit. *Id.* ¶ 26. Petitioner is still released from his cell for 30 minutes a day, but at different times each day. *Id.* Petitioner also reports that he is given his blood pressure medication once in the morning and once in the evening, but his blood pressure is not checked daily as it was in the medical unit. *Id.* ¶ 27.

### e. Petitioner's Immigration and Criminal History

On or about September 16, 2004, Petitioner was admitted to the United States in New York, New York as a nonimmigrant with authorization to remain in the United States until March 15, 2005. *See* ECF No. 13-6, IJ Decision. On January 28, 2019, Petitioner was convicted in the Southern District of New York of the offense of Distribute and Possess with Intent to Distribute Heroin in violation of 21 U.S.C. § 841(b)(1)(B) and sentenced to time served and two years of supervised release.[19] ECF No. 13-7, Criminal Judgment of Conviction. On January 30, 2019,

---

[19] This federal drug conviction resulted from his history of addiction and a minor role he played in a heroin sale. *See* ECF No. 1-6, Rohan Decl. ¶ 24. At the direction of his drug dealer, Petitioner carried a bag containing drugs and delivered it to an undercover DEA officer, and he did this in exchange for a small amount of heroin for personal use. *Id.* ¶ 25. Both the federal judge and the Assistant United States Attorney stated on the record that Petitioner played a very minor role in the scheme, and the federal judge who presided over his criminal case noted at sentencing that Petitioner "is by all accounts an exceedingly minor participant in this crime. His own minimal involvement here . . . was driven by his own sad heroin addiction and there is no doubt that what he needs is treatment." *Id.* Petitioner was sentenced to time served, a sentence that was below the sentencing guidelines for his conviction. *See id.* ¶ 26; *see also* Criminal Judgment of Conviction. Petitioner also has several less serious convictions, which are discussed at Footnote 26.

11

Petitioner was detained by ICE and served with a Notice to Appear ("NTA"), charging him with removability pursuant to Immigration and Nationality Act ("INA") section 237(a)(1)(B) as a nonimmigrant remaining in the United States longer than permitted. ECF No. 13-8, Notice To Appear.[20] Petitioner's Distribution and Possession with Intent to Distribute Heroin conviction qualifies as an offense relating to a controlled substance and subjects him to mandatory detention under section 8 U.S.C. § 1226(c).

## II.     STANDARD OF REVIEW

Under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that his custody violates the constitution, laws, or treaties of the United States.  28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). A petitioner may seek Section 2241 relief only in the district in which he is in custody.  *United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009). This Court has jurisdiction over Petitioner's claims as he is detained within this district and alleges that his continued detention during the COVID-19 pandemic violates the Due Process Clause of the Fifth and Fourteenth Amendments.

Petitioner has filed a TRO seeking his immediate release from detention, which the Court construes as a request for a preliminary injunction. *See Hope v. Warden York County Prison*, 2020 WL 1922372, at *2-4 (3d Cir. Apr. 21, 2020). Motions for temporary and preliminary injunctive relief are governed by a four-factor test. The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief.  *Id.* at

---

[20] Respondents state that the date of January 30, 2018 in the Notice to Appear is a typographical error.

176, 179. "If a plaintiff meets the first two requirements, the District Court determines in its sound discretion whether all four factors, taken together, balance in favor of granting the relief sought." *Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019).

The Court also considers whether Petitioner has established extraordinary circumstances justifying his release. *See Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986); *Landin v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Soule's*, 688 F. App'x 134, 135-36 (3d Cir. 2017).

### III. ANALYSIS

Courts in this district and in neighboring districts have, in the last two months, released medically vulnerable ICE detainees from detention facilities; those decision include one from this Court releasing medically vulnerable petitioners at HCCF. *See, e.g., Cristian A.R. v. Decker*, No. 20-3600, ECF No. 26 (D.N.J. April 12, 2020) (finding that the protocols in place at HCCF and Bergen County Jail did not adequately protect medically vulnerable detainees and holding that continued detention such detainees during COVID-19 pandemic amounted to punishment under the Fifth Amendment); *see also Rafael L.O. v. Tsoukaris*, No. 20-3481, ECF No. 25 (D.N.J. April 9, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Jeferson V. G. v. Decker*, No. 20-3644, 2020 WL 1873018 (D.N.J. Apr. 15, 2020); *Marvin A. G. v. Decker*, No. 20-1689 (D.N.J. Apr. 14, 2020); *Kevin M.A. v. Decker*, No. 20-4593, 2020 WL 2092791, at *10 (D.N.J. May 1, 2020). The Court now analyzes whether Petitioner in this action has satisfied

the standards for a preliminary injunction and has established extraordinary circumstances needed to warrant release from habeas detention.

### a. The Gateway Factors

Petitioner asserts that his conditions of confinement amount to punishment under the Due Process Clause and that Respondents' failure to address his medical needs during the COVID-19 outbreak amount to deliberate indifference to those serious medical needs.[21] The Court first addresses whether Petitioner's conditions of confinement amount to punishment.

Recent decisions in this District have established the legal backdrop governing conditions of confinement claims brought by civil detainees. *See, e.g., Cristian A.R.*, No. 20-3600; *Rafael L.O.*, 2020 WL 1808843. Civil detainees are entitled to due process and may bring conditions of confinement claims under the Due Process Clause of the Fifth (or Fourteenth) Amendment as opposed to the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979); E*.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019). The Fifth and Fourteenth Amendments protect civil detainees like Petitioner from any—*not just "cruel and unusual"*—punishment. *See Hubbard v. Taylor*, 399 F.3d 150, 166-67 (3d Cir. 2005).

To determine whether Petitioner's conditions of confinement constitute punishment, the Court asks whether the challenged conditions are reasonably related to a legitimate governmental objective, and if they are not, it may infer "'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'" *E.D. v. Sharkey*, 928 F.3d 299 307 (3d Cir. 2019) (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). A condition or deprivation amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials"; no "alternative purpose to which [the condition or

---

[21] Petitioner does not argue that 8 U.S.C. § 1226(c) is unconstitutional as applied to him, and the Court does not address this argument, which misconstrues the basis of Petitioner's claims for relief.

deprivation] may rationally be connected is assignable for it"; or the condition or deprivation is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)). The Court considers "the totality of the circumstances within an institution" to determine whether given conditions constitute punishment. *Hubbard*, 399 F.3d at 160 (internal quotation marks and citation omitted). Civil detainees, like inmates, may be entitled to relief if they prove threats to personal safety from exposure to serious contagious diseases. *See Cristian A.R.*, No. 20-3600, slip. op. at 19 (citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993)).

Respondents assert that HCCF has sufficiently implemented recommendations from the CDC to combat the spread of COVID-19 at the Facility. Opp'n at 20-21. In *Cristian A.R.*, the Court analyzed the conditions of confinement at HCCF during the COVID-19 pandemic and concluded that HCCF failed to protect the most vulnerable detainees in its care. *See* 2020 WL 2092616, at *10-12. Here, the Court finds that the improvements over the last two months, including providing a single reusable mask to each detainee and housing high risk detainees by themselves, *see* Edwards Decl. ¶ 25, are laudable but insufficient to change the Court's analysis. Here, it is not clear that Petitioner would qualify as high risk due to his hypertension diagnosis, which was recently added to the list of CDC Risk Factors. Furthermore, Warden Edwards acknowledges in his most recent Declaration that HCCF is only testing symptomatic detainees test for COVID-19 and makes it clear that HCCF has no plans to test the entire detainee population. *See id.* ¶¶ 15, 24. Although HCCF contends that there are few new positive cases among inmates and detainees, its stance on testing prevents the Court from determining whether the dearth of new positives is due to the lack of testing or successful containment measures. As Petitioner points, out

the high percentage of positive tests among detainees that have been tested and among law enforcement suggests the former.

As to Petitioner's medical conditions, Respondents do not contest that Petitioner suffers from hypertension, nor that he has an enlarged heart. *See, e.g.*, Opp'n at 14. Instead, they urge that Petitioner has not adequately shown that his medical conditions place him at higher risk, *see* Opp'n at 3, 9-10, 21-22, 31-32, despite the fact that he has submitted a declaration from a medical expert attesting to his risk level and has provided.[22] The CDC, however, recently expanded its list of medical risk factors for COVID-19 to include hypertension based on the most recent available data.[23]

Here, the Court finds that Petitioner has provided sufficient evidence that his hypertension and enlarged heart place him at increased risk of complications were he to contract COVID-19. Through his sworn declaration, he has provided ample evidence that he is unable to practice social distancing or adequate hygiene in both the general population and the medical unit, and Respondents have not rebutted Petitioner's evidence that these protocols insufficient to protect medically vulnerable detainees from harm. As such, he has shown a likelihood of success on the merits of his constitutional claim that his detention at HCCF during the COVID-19 pandemic amounts to punishment in light of his particular vulnerabilities.[24]

---

[22] That Petitioner has presented the opinion of a medical expert indicating that he is at high risk distinguishes his case from those cited by Respondents. *See Carmen R. v. Decker*, No. 20-3875 (ES), 2020 WL 2029337, at *8-9 (D.N.J. Apr. 28, 2020) (concluding that petitioner who submitted a single record referencing asthma failed to substantiate an asthma diagnosis); *Barbecho v. Decker*, No. 20-2821, 2020 WL 1876328, at *1, *3 n.2 (S.D.N.Y. Apr. 15, 2020) (petitioners were pre-diabetic, smokers, or had high blood pressure but did not take medication for it); *Verma v. Doll*, No. 4:20-CV-14, 2020 WL 1814149, at *5 (M.D. Pa. Apr. 9, 2020) (petitioner had not submitted any particularized evidence as to his conditions or treatment at facility).

[23] *See, supra*, Footnote 13.

[24] Civil detainees also have a constitutional right to adequate medical care, including the creation of policies ensuring adequate health care, and such claims are governed by the deliberate indifference standard. *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003) (holding that a reasonable jury could conclude that a governmental entity's failure to establish a policy to address inmates' immediate medication needs constituted deliberate indifference); *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 585 (3d Cir. 2004)

To be entitled to a preliminary injunction, a movant must also establish that he or she is "more likely than not" to suffer irreparable harm absent the requested relief. *See Reilly*, 858 F.3d at 179. Here, as the Court found with respect to the petitioners in *Cristian A.R.*, Petitioner here has likewise shown a likelihood of irreparable harm due to his medical vulnerabilities and the conditions of confinement at HCCF. 2020 WL 2092616, at *12. The Court rejects Respondents' argument that Petitioner's likelihood of contracting COVID-19 is speculative. As the Supreme Court observed in *Helling v. McKinney*, 509 U.S. 25 (1993), "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Id.* at 33 (noting that "the Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event").

### b. Balancing of the Equities and Public Interest

That brings the Court to the balancing of the equities and the public interest. "Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (internal citation omitted). In *Cristian A.R.*, the Court found the potential of injury to petitioners to be high and also found that the public interest supported the release of Petitioners before they contract COVID-19 to preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems. *See* 2020 WL 2092616, at *13 (citing *Rafael L.O.*, 2020 WL

---

(detention center's lack of policies to address the physical and mental health needs of residents caused the plaintiff harm). Because the Court finds that Petitioner is likely to succeed on his claim that his conditions of confinement amount to punishment and because deliberate indifference has a more stringent *mens rea* requirement, it need not reach the deliberate indifference claim.

1808843, at *9). The same is true here, albeit to a lesser extent, as hospitalizations in New Jersey have declined in the two months since the Court issued its decision in *Cristian A.R.*[25]

Respondents also have a legitimate interest in ensuring that Petitioner does not flee and in protecting the public. As Judge Vasquez found in *Rafael L.O.* and this Court recently found in *Cristian A.R.*, those very important interests are adequately addressed here by fashioning appropriate conditions of release. *See Cristian A.R.*, 2020 WL 2092616, at *13.

Petitioner has a 2019 conviction for a federal drug offense, a serious, albeit nonviolent, crime, which accounts for his mandatory detention pursuant to 8 U.S.C. § 1226(c). This federal drug conviction resulted from his history of addiction and they very minor role he played in a heroin sale, which was acknowledged by both the AUSA and the federal judge who sentenced Petitioner to time served, below the federal guidelines for the offense.[26] *See* Rohan Decl. ¶¶ 24-26.

Petitioner also has significant ties to this country and the New York area, including his twenty-year-old United States citizen son and his mother, a lawful permanent resident, and his brother and sister, who are both United States citizens. *See* Rohan Decl. ¶ 27. If released, Petitioner plans to live in his mother's home in the Bronx. *See* ECF No. 15-3, Supp. Rohan Decl. ¶ 2.

Having considered Petitioner's individualized circumstances, including his criminal history, the Court is satisfied that there are reasonable conditions that can adequately protect the

---

[25] *See N.J. coronavirus deaths increase to 11,970 with 162,530 total cases. Hospitalizations fall below 2,000 for 1st time in months,* NJ.com (Jun. 4, 2020), https://www.nj.com/coronavirus/2020/06/nj-coronavirus-deaths-increase-to-11970-with-162530-total-cases-hospitalizations-fall-below-2000-for-1st-time-in-months.html,.

[26] Petitioner's other criminal convictions are far less serious and do not weigh against his release. In 2010, in Queens, Petitioner pleaded guilty to New York State Vehicle and Traffic Law § 509.1, driving without a license, and received a sentence of a $300 fine and fifteen days incarceration. Rohan Decl. ¶ 23. In 2013, in the Bronx, he pleaded guilty to New York State Penal Law §240.20, disorderly conduct, and received a sentence of conditional discharge. In 2016, in the Bronx, he pleaded guilty to New York State Penal Law §240.26, harassment in the second degree, and again received a sentence of conditional discharge. None of the three above-mentioned convictions are considered criminal dispositions under New York state law, but rather infractions or violations.

public and ensure his appearance for future immigration proceedings. The specific conditions of release are set forth in the Order accompanying this Opinion.

### c. Extraordinary Circumstances Warranting Release on Bail

Finally, for the same reasons outlined above, the Court also finds that totality of the circumstances here warrant the extraordinary remedy of release on bail, and make bail necessary, to make the habeas remedy effective. *See Cristian A.R.*, Civ. No. 20-3600, ECF No. 26 at 28 (citing *Landano*, 970 F.2d at 1239).

### IV. CONCLUSION

For the foregoing reasons, Petitioner's Emergency Motion for a Preliminary Injunction, ECF No. 1, is **GRANTED**, and the Court orders Petitioner's immediate release subject to the conditions as ordered. An appropriate Order accompanies this Opinion.

Dated: June 30, 2020  */s Madeline Cox Arleo*
**Hon. Madeline Cox Arleo**
UNITED STATES DISTRICT JUDGE